We'll turn to the second and last case on our calendar, which is Calixto v. City of New York. Ms. Drucker, go ahead. Thank you. Your Honors, may it please the Court, Alina Drucker on behalf of the appellant, City of New York officers. Your Honors, the video in this case is the beginning and the end of the qualified immunity question, because it establishes all of the possible facts that could have precluded resolving those questions on summary judgment, both as to the excessive force and the probable cause and the false arrest claim. Excuse me. I'll turn first to the excessive force claim. The plaintiff's allegation... Could you describe first, just so we get the setting here, the actual setting? We've seen the tape and the officers rushing in and all of that. What exactly was... what's the scene here? Give us the scenario. Of course. The officers received through the radio dispatch, and you can find that, the record A-72 is the transcript, of a 911 call a few doors down from this. It's like just before 1 a.m. that a group of males with a stick are trying to break into a restaurant. The officers arrive on the scene with their lights. That hasn't been disputed. The lights can be seen on the video, and the plaintiff also testified to that and admits it in her 56.1. And as they roll up onto the scene, they see, according to their declarations, also according to the video, also according to her own testimony, she sees them. And I can... why don't I step back for a second and tell you what's happened before. So from the officer's perspective, they show up and they see this group, take note of them, and turn and start to flee. At the same time, they see the woman pivot, holding a stick, matching quite the description of the 911 call. The suspect's matching the description. This woman, holding the stick, pivots into the doorway, which is a choke point. So they can't go around her. It's not like a wide sidewalk. What exactly are they after? Why are they there? And why this rush into this building? So two things. So first of all, the 911 call is not a noise complaint. It's about a fairly violent, belligerent, potentially, group who have now run into a building. They don't know if it's their building, someone else's building, there are innocent people inside. They've run into the building where they could be lost, get armed. What did they think they could possibly have done? I think what an objectively reasonable officer in the shoes of their officer could think is that they could... What was the call about? Why were they there and why were they rushing after these people? So the call was that there were three men with a stick trying to break into a restaurant, banging on the glass. So this, yeah, that's what you didn't say before. I'm sorry. And I was about to ask you, somewhere I thought this was characterized as an attempted burglary. Yes, that's right. They're not words that you use. I'm sorry. So what is it, so what the 911 call, based on the 911 call, they thought they were looking for burglary suspects? They were looking for a group of men who were attempting to burglarize this... What were the words of the dispatch that they got? I think that they are trying to break into the glass. They're trying to break into this storefront. And using a stick. Using a stick. And if you see the surveillance video, you can see a minute earlier, maybe two minutes earlier, these men appear on the screen. This is specifically three. Three. In the dispatch, right? That's right. That's what the 911 call reported. And so... I mean, it's hard to tell what the 911 call said. Right, that's right. If you look at the dispatch sheets, the event chronology, 7273, right? Yes. What is that? That's what the 911 caller transmits, I'm sorry, 911 dispatcher says to Rodriguez, right? That's what he says, yes. The dispatch that goes to the officers. So that's what the officers know. That's what frames our analysis at qualified immunity. So these officers are looking, like I said, it's not a noise complaint. They're looking for potentially serious, and the range for what that could be, they don't know, right? So they're looking for a group of men with a stick who've just tried to break into a restaurant. The people who called were frightened. I think they might have mentioned that they thought the people were drunk. And they've gone, run into this building, dark inside. It's kind of the middle of the night. They don't know where they're going. They don't know if they could arm themselves. They don't know if they could hurt some bystanders inside. And this woman has pivoted her body into the way of the door, whether she says it was reflexive or not. And she's got a stick in her hand. And as you can see, if you slow down, and you can see in the video, excuse me, I'm sorry, that the son takes the stick. The son has the stick in the video. It's a stick, sizable stick. He hits a ride-on toy with it that's out in front of the building. And then he's just sort of standing around with the stick. The mother comes down. She takes the stick from him. And so we know it's the stick that came from that man. But that doesn't matter. The officers don't know that. What the officers know is they see a woman holding a stick in the doorway. She pivots as the police start to give chase. And she reflects whatever the officer's perspective is. She turns and lifts the stick at eye level to Officer Rodriguez. And he shoves her out of the way hard onto the ground and keeps running in where they ultimately capture two of the men. This all takes place in what, about five seconds, ten seconds? One second. From the moment you can look at the counter on the video, the officers' lights appear on the screen at 12.53. The push is at 12.54. So we're talking the moment, the pivot, the running into the building, the sweeping. All of that takes place in a second. So all of those are split seconds. At 12.53, 12.53.59 seconds, at least as I looked at it, the officer is outside the door and the plaintiff has the stick raised in his direction. Exactly. And then at 12.54 exactly is where I see the push happening. I'm just one person looking at it. Right. That's one second. Yeah, we're talking about it. Well, those are. Yes. So we're talking about a second. And a split second is. Thirty-eight seconds later, she's back on her feet. That's right. Thirty-eight seconds later, she's back on her feet. Within, I think, a minute or a few minutes, the many other officers arrive on the scene and we can get to where we are. Do you think it's not reasonable for us to think that a police officer running at this speed in these circumstances has mishandled the situation in a grievous, unconstitutional way? I think that would be unreasonable, yes, Your Honor. I think that, at a minimum, it wasn't clearly established that an officer could not push aside a woman holding a stick in a choke point in a hot pursuit who seems to be affiliated with the men, at least minimally, as she was talking to them, which changes the calculus in some ways, too. I mean, Judge Deary, who's an experienced prosecutor and a very able one, somehow is relying on important authorities here, nothing like, like, nothing as important as the Yale Law Journal and the California Law Review. So what do you make of this? Where did he go wrong? Well, I'll say it's not relevant to the legal analysis, Judge Deary's opinions, about the merits of qualified immunity as a doctrine. And I don't think that this case moves the meter at all. So this is not, I think, maybe sort of missing the ballpark on the case. You said that Ms. Blystow was merely in the way of the officers and that she wasn't deliberately interfering with police objectives. Well, her subjective intent, as this Court said in Garcia, is sort of besides the point. The point is what the officers coming to the scene perceive, or a reasonable officer in the shoes of our officers, knowing what they know, perceive or could perceive and could reasonably believe would be a lawful act. Or the real question is whether no reasonable officer could think under the circumstances that pushing her out of the way wouldn't be lawful. Now, if she subjectively believed that she didn't do it on purpose or she was reflexive or what, I mean, that all goes to some question about her criminal conduct and whether or not. But it does not go to whether these officers have qualified immunity or whether from their perspective. They're only subtly different, but they are different. One goes to the excessive force, which I think is exactly as you stated the issue. The issue is entirely whether a reasonable officer would have thought it was necessary under the circumstances to move her out of the way and that the degree of force that he used was appropriate to do that. Her subjective intent is relevant to the arrest claim, at least to the extent that, again, the question is from the standpoint of the reasonable officer, was there reason to believe that she was intentionally instructing governmental administration? Absolutely. It's a very subtle difference because, again, I think you're right that whether she actually intended to obstruct is not the issue here. That would be the issue in a criminal case. But it is a slightly different issue, at least, whether they just needed to move her, whether she was there for good reasons or bad or neutral, is a slightly different question than whether they had reasonable cause to believe that she should be arrested. See, I'm over my time. May I answer? Thank you. And to answer, and I think that's completely correct, if I can move to the probable cause for the false arrest. There is arguable probable cause here because while if there were absolutely no — in Garcia, this court basically said that the officers can't intuit what the mens rea of the person is. So we have to look at her conduct from an objective perspective. And what we're seeing here is a woman who's clearly — I mean, she's not a bystander, right? She's speaking with these men. She pivots into the doorway. Whether she now says it's not intentional, there's a — a reasonable officer could believe it was intentional. Her sort of — you can see her conduct is consistent with her own testimony later that she saw the officers and wanted to get her kid out of the way, right, and out and upstairs. So she was, in fact, obstructing, and an officer could see this obstruction and with the stick and going up in her — in the officer's face while she may now say that wasn't intentional. A reasonable officer, at least some reasonable officer, could, coming to the scene, have at least arguable probable cause to believe that that was all intentional obstruction of governmental administration. Just for our purposes here, are we to assume that a reasonable jury could find that the named defendants, who are the plainclothes officers who first arrive on the scene and rush in, it's — For our purposes on this appeal, do we — we're judging on the assumption that they made this decision or at least were sufficiently implicated in that decision that this is an issue for us, is what they — Yeah. I don't see how it is an issue for you for at least maybe three reasons. First, because the video, if you watch it, you can see the officers are actually communicating and pointing at her, so — in the moments after. So it's hard to imagine that any reasonable juror could even create — have a question about whether or not those officers were involved or communicated. So they're the right defendants, whether they are rightfully made defendants. They're the people that we — To the extent that they are the defendants in this case and their involvement in her arrest decision, they also have the probable cause from personal — so I just don't think it's an issue in this — on this fact scenario. Thank you. Thank you, Your Honors. Thank you, Ms. Stark. Thank you. We reserve some time. Good morning. Good morning. May it please the Court, Lyssa Greenstark appearing for Appelli and as Calixto. There are, of course, two overarching issues here, whether there was qualified immunity for the excessive force used and also qualified immunity for the false arrest. I will turn to the excessive force first. And it's our position that defendants' entire framing of this issue ignores the central question. It is not whether Defendant Rodriguez may have had the right to move Ms. Calixto aside in some manner in order to pursue her son, but whether the manner that he did it — He should not have been running. Not that he should not have been running. If you watch the video, it's the moment — I've watched the video. It's the moment where he places his hand on her head. And she's 5'1", unathletic, 50-year-old woman. It's approximately two seconds, five seconds, right, a person rushing into this building. Is that right? Yes. Well, they pull up. I think there may have been a little bit more than five seconds where you can see the lights reflecting on that awning, basically. But at the moment when he's moving her, right, I mean, he runs towards the door. And at least as I observe on the video, he's sort of almost running as if to go around her. And she turns into him in such a way that I take it when you say this is how we should frame the issue is the degree of force, right? At that moment, it sounds like you're conceding that he had some sort of right or it was reasonable for him to decide that he needed to move her out of the way, right? Yes. Now, how do you suggest that he should — pretend we're the jury. How do you argue exactly that he should have behaved? He should not have touched her head but should have touched her shoulders? Well, I think that these are trained officers, and they are trained. And, in fact, you see a different officer, officer of suspicions, move a different individual who's blocking the door. And you see him. He takes him in a controlled hold, and he moves him to the side. When was that? That was sometime later. That's probably a second after Ms. Calixto is thrown to the ground. Now, the way in which — At that point, there's no one impeding the entrance. The male individual is, in fact, still — he is impeding the entrance just as the daughter of Ms. Calixto had been. Isn't he one of the people who's arrested, or is that a different situation? He's actually let go, apparently. But he's one of the three. Two people go in, and one is standing by the door. Correct. I don't believe he is apparently one of the three who was banging on the door because there is an I.D. procedure done later by the owner of the restaurant. And that individual who is moved aside, not arrested, not charged with OGA, though he's arguably also blocking this entrance when the police officers first approach, as is the daughter. Both of them are moved aside. They are not arrested. They are not injured. And they were dealt with reasonably. And the question is whether this maneuver that he — that Rodriguez engages in, it's not even a real maneuver. What he does is — and you almost can see it in the video. He doesn't really look threatened. He stops the stick very easily. Then he takes his hand, and he, with untempered force, throws her to the ground, causing her face to smash on the ground. And the question is, was that a reasonable response to a 5'1 woman — I mean, you're speaking to sticking his face, right? She turns. She's already holding the stick exactly — she turns exactly as she's holding it. And the stick is probably 4 feet long, maybe, right? But at 124, she's sticking it in his face, in Rodriguez's face, right? I think she — but I think there's a reasonable viewing of the video that she turned towards him and that a jury could credit, that she's not wielding this stick at him as a weapon. Oh, sure. Oh, sure. But that's not the issue. The issue is he's got a stick in his face. But he easily — and you can watch it on the video — he grabs the stick, he controls the stick. And he is running at high speed simultaneously, right? Yes. But he does — he controls the stick, and he seems not threatened at this point, but bothered. This person's in my way. And I — Well, he's a little worried, though. He's pursuing three guys who are running away from him into an apartment that a restaurant owner said they were trying to break into the restaurant. Well, the restaurant owner — Do we think about that in the objective police officer's evaluation of trying to get into that apartment building? Just briefly, the restaurant owner said that there was three men banging on the window. It does eventually go over as a code for burglary. But I don't believe there's any allegation by that complainant or that ever is received. A73, burglary in progress. I believe that is the code that's put over by the dispatcher. So I'm not saying that the police didn't hear that. But the information that was provided from the actual complainant that appears to have gone over dispatch — But Officer Rodriguez understands this to be a burglary to which he is responding. Is there any doubt about that or any dispute about that? He in all likelihood would have heard that, but we don't know. We actually don't know what information he actually heard come over the radio because we — that's not in the record. Is there any other information that went over the radio? What goes over the radio is burglary in progress, and this is the first police car to respond to the scene. But routinely — So we think he didn't hear that. He heard something else? Your Honor, all I'm submitting is that routinely when police officers give testimony in these sorts of cases, the information that they say that they heard is not always exactly what came over dispatch. And we don't know what was in his mind. We don't have that information. We have a document with information that went over. We don't know if they actually — This is a summary judgment, this case. Correct. Depositions — Was he deposed? No, depositions were never held because the city first moved to dismiss. We then amended as write. They then renewed their motion to dismiss. Before that decision was issued, they converted — they essentially converted that to a summary judgment motion and moved for summary judgment. We have his affidavit. We have his affidavit. It doesn't address, I think, specifically what they heard came over the radio. Paragraph 4. About the time I heard a radio broadcast for a burglary in progress in front of the Scene Fronteras restaurant, 570 block, 5700 block of 5th Avenue. Sorry, Your Honor. I guess he did represent that. I guess my point would be we've never probed him on that information. But the question, again, about the stick, this is not necessarily a self-defense case. You say he wasn't threatened. He was bothered because she was in the way. If she was in the way with a stick, why isn't — then he isn't — you're not disagreeing that he's entitled to move her out of the way. But — well, I'm not disagreeing, but I do think there's a range of ways that he could respond to it, and that there is obviously a reasonable way to move somebody, and there has to also be an unreasonable way. But while you are trying to get in, you're not — and you're also not disputing that it was appropriate for the officers to enter the building and chase the suspects, right? I don't think that we can on this record, but I — So it's not just a question of — you know, this is a demonstrator, and she's obstructing a doorway, and it's appropriate to get her to not block that doorway while — you know, for whatever purpose. This is a case where the officer is trying to get into the door in order to apprehend a suspect who has now entered a building where, putting aside the more dramatic scenarios that Ms. Druker suggested, could just enter an apartment. And then they wouldn't know what apartment he went into, and they wouldn't have any ability to pursue them into someone's apartment. So there's some urgency to get in the door in time to stop and at least question these suspects. Yes? You would agree with that? Yes. So in that urgency, in that one second, you're saying that it was unreasonable for the officer to use enough force to just push her aside, as opposed to what was happening with the other officer and the other gentleman, where the problem was just, okay, we're moving him for whatever reason, possibly not to get him out of the way, but possibly because he was still a suspect at that point, or what happened with the person who may or may not be Ms. Kligstra's daughter, who's also kind of in the doorway, but it's very clear from the video that an officer could get past her at that moment. But this is like, it almost looks like a kind of football play. When she turns around, she's blocking him, and she's blocking him, intentionally or otherwise, in the exact path that he's trying to use to get into the door, and in fact, which was not being blocked before she turned. And so you're saying we should be calibrating, should he have touched her head, should he have touched her shoulders, should he have bear-hugged her and gently moved her in some other direction, right? I mean, that's the argument, that it was just unreasonable for him to just push her and keep on going where he was going. I think the argument is he didn't just push her. The way that he pushed her was in a dangerous, extremely untempered, forceful push to the head, which alone is more likely to result in serious injury. The manner that he did it was unreasonable. It was unreasonable for a trained police officer who is trained in dealing with these situations, trained to move people. Is there evidence in the record of any sort as to specific training, for example, like the chokehold situation, that there's something in the patrol manual or something in some expert police witness who says, here's how you move someone out of the way when you're rushing into a building and they're blocking you? So what evidence is there about the training? Well, I think that from our familiarity with training materials, generally, again, because of the posture of this case and when summary judgment was moved for, we have not had expert discovery. We have not had an opportunity to have a police practices expert testify as to whether this was. Propose an affidavit from someone or anything like that. Well, at the time that the city moved for summary judgment, we raised with the district court that discovery was not completed and that we thought this was not right for summary judgment. And the court ruled that it was right for summary judgment. So we do believe that issue is preserved, having objected to the city being allowed to move for summary judgment. Is it a part of your argument that if we agree that on this record the district court erred, that we should remand to allow further discovery or something like that? I mean, I didn't see that in the brief as a suggestion. I thought it was a sort of binary decision where we've got a record and there's either qualified immunity on that record or there's not. Well, there was some citations to the fact that because discovery had not been done, that the standard for summary judgment, the standard for proof would be higher on the part of the move-ins. But, again, I do think that there is a real question as to this method that he dealt with this woman. And I think it goes to some of the cases. We have the affidavits of Francisco de los Santos and of Richard Rodriguez, right? Yes. Are those two affidavits contested by competing affidavits? Well, we have the affidavit of Ms. Calixto, and I do think she contests ‑‑ well, first of all, I think there's some real questions to question the credibility of those affidavits. I do think, first of all, de los Santos' representation, that when he stops and speaks to Ms. Calixto as she's lying on the floor, that his intention there or what he did was ask her if she was okay, I think is just belied by the video. I mean, he appears to be yelling at her and telling her to stay down or something to that effect. We don't know, again, exactly what he said. The video doesn't have sound. No, but ‑‑ He looks at her, looks down at her, maybe says something to her in whatever tone of voice he says it, and then having said it, he turns and runs inside. But at a minimum, we don't know what he said. But he ‑‑ the only person who says what he said is him. Did Ms. Calixto say in her affidavit or her testimony in any way that he yelled at me and told me to stay down? I do believe that she says she was not offered ‑‑ I believe there is testimony in perhaps her 50H or in her affidavit that that is not correct, that she was not offered aid in that moment or not offered aid by the police. I think there's also ‑‑ Did she say that he, the second officer, came by and yelled at me to stay down? That is not testimony that she said, no. Okay. That's your suggestion of what we should infer from the video from the way his mouth is moving, that that's probably what he was saying? From his gestures. And to me, his characterization of what he said does not seem consistent with the way he's gesturing and his posture in the video. I ‑‑ Why would he even bother to stop and tell her to stay down? She's down. If he's just interested in chasing the suspects, he has a clear path he could chase the suspects. Why would he stop and talk to her at all if not to say, you know, what's happening here or is it you okay or something like that? Why is that incredible? Well, I ‑‑ we don't know, again, because that testimony has not been taken and we haven't had an opportunity to probe that. Okay. Got it. Thank you, Ms. Green. Thank you. Appreciate it very much. We'll hear from opposing counselors reserved two minutes. If I may, just on two points. First, I heard a lot of talk about how the officer should have more perfectly calibrated the amount of force he used. That's exactly what the qualified immunity doctrine sort of protects against is this we have time for sober reflection here to think about how a little bit less force might have also been enough. But in the heat of the moment, in a hot pursuit, I don't think the officer has the benefit of that. And as your office owners are aware of this, I mean, the stick in his face changes the scenario a little bit in terms of how much force he can offer even in the realm of objective reasonableness he could use, which is why I don't even think we need to get to the second prong of qualified immunity on that. And then I'd like to turn next, if I may, to the complaints about there being an inadequate opportunity for discovery. I mean, there was a case management conference. There was an order given by the magistrate judge, Judge Mann, that said discovery. The plaintiff didn't notice depositions of the officers. That was a strategic decision. Perhaps they thought that things would change because of the motion to dismiss. But that. Magistrate Judge Mann supervised whatever discovery there was. Yes, and there was an opportunity. They also did propound discovery requests, I think, that the city produced over five. I mean, there are documents in the record. There are hundreds of pages of records in response to discovery. And frankly, no discovery could change the outcome here because the video establishes all of the key facts necessary. Was there a request for further discovery or for an opportunity to depose the affiance? No. My understanding is that the only time any request came for more discovery was in response to the summary judgment motion. They said, I'd like more time. And the city opposed, said you had an opportunity. The court denied it. And then they had an opportunity under Rule 56D to continue that as an objection in their summary judgment papers. And what 5060 gives. They didn't. And because they didn't, they've waived these arguments. They've raised them for the first time on appeal in opposition. But they aren't preserved because Rule 5060 is pretty clear that if you believe that summary judgment has been made prematurely, you need to follow the procedures that are set forth in that rule. Thanks very much. Thank you. We'll reserve decision and we are adjourned. For Spence adjourned. Thank you. Thank you.